I understand counsel for the appellant, you would like to reserve two minutes for rebuttal. That is correct, your honor. Thank you. Thank you so much. Good morning. May it please the court, Matt Darby on behalf of Mr. Ziparo. We're here today to consider, again, the Ziparo case and this time the issue of causation and whether or not the plaintiff is entitled to have a jury consider the question of causation on the contributing factors standard of the court. I understand Murray v. UBS is for this court, your honor. Yes, your honor. Should we, must we await that decision? We can hear your argument, but possibly before we decide. Mr. Devine and I had that very same question and we figured that the court would probably bring that up. You know, the Murray case obviously does change the landscape and I suspect that the Second Circuit panel will be reviewing its decision to see how the Murray. I'm sure one of the judges is in both cases. I understand that. So we're at the mercy of the court on that for sure, your honor. I mean, I can see the logic of that, certainly, and it saves some time. I do have a question, though. How much do you think the Supreme Court's Murray decision affects the five factors in Tompkins? That's interesting, your honor. I think it does. And if I may suggest that the reason I believe it does is twofold. One is that obviously the Tompkins case did use the prior standard that had been adopted by the Second Circuit and the Eighth Circuit. But also, the question about Tompkins that I had really isn't related to Murray, but I do think that part of what my argument is is that Tompkins has maybe been extended, respectfully, beyond what the Eighth Circuit meant in the Gunderson case. And the reason I say that is because in the Gunderson case, that obviously was relied on by Tompkins, what the court said is that in reviewing this issue, five highly relevant facts stand out. That's in Gunderson. Then it kind of morphed into a five factors test. And I think that one of the things that is important in any of these whistleblower cases, and probably this one even more so than any, you know, we're not dealing necessarily with contracts like the prior case. What we're dealing with is human beings and their reactions. Maybe it's more like the first case that we dealt with. And I think that really defies a five factor type approach that was taken, respectfully, again, in Tompkins. The reason is because this case is extremely unique, right? For example, one might, and we suggested that a Ray analysis in our brief, that the Ray factors may be more appropriate. In Ray, it was one of the circuits that had not adopted the retaliatory animus standard. And that listed several factors to take into consideration. Some of the Tompkins factors may be relevant as well, but I think each- Well, that would be helpful for you to go through which Tompkins factors you think, granted, not knowing how relevant Tompkins is going to be in the future, but which of the Tompkins factors you think are on your side versus CSX. Yes. And so the first factor that the court considered was the discipline related to protected activity. And you know, that issue is certainly relevant, for example, in a case where, you know, which some of these cases deal with, where, for example, somebody reports an injury and then they go back and look at a video and say that they, you know, violated a rule, right? Here, there really isn't necessarily the type of relationship that I think makes that factor- It's not the type of case that makes that factor to be relevant. Temporal relationship, certainly temporal relationship, I think is a factor in every case. I think that's strong in our favor. The Tompkins kind of interweaves that without intervening cause, which I think is, you know, a separate factor. It's more about the pretext of the termination. I respectfully think that the, what happened at the Railway Labor Act hearing is, let me say it this way. What happened at the investigation is relevant in terms of what was said and what was relied on the impact of that. However, the ultimate decision should not, in my view, be relevant. So, would you concede that the fact that he was represented in the proceedings and neither of the people whom Zaparro complained about would go to CSX? Are those two factors that, assuming Tompkins, is still relevant? I didn't quite understand the last part of that, Your Honor, I apologize. If Tompkins is still relevant, would you concede that the last two factors lean in favor of CSX? The fact that he was represented by counsel and that neither of the people whom he complained about were in the, were decision-makers? You know, Your Honor, it gets into the next point that I'd like to talk about, and that does get into Murray, which is, you know, the reason that the Honorable Court reversed the trial court and the jury verdict was because it found the supplemental instruction to be inappropriate, if you recall. I'm sure you do. And when the Supreme Court decided that case, they cited that instruction and basically said no, you know, by implication, that instruction is fine. So that supplemental instruction that was given at the request of the jury asking for Murray should consider whether anyone with the knowledge of Murray's protected activity, because of the protected activity, affected in any way the decision determining Murray's employment. And that's very consistent. One thing Murray obviously also says to us is, I think, that we need to really look back at the statute. And on that point, in B1A, it says a railroad carrier engaged in interstate or foreign commerce or any officer or employee of such a railroad carriage should not discharge blah, blah, blah, blah. So Van Blarkham, who is highly motivated by money and, you know, three basic motivators, greed, fear, and greed, he's highly motivated by money, right? And then he has the added element of fear, right? Because now the ethics complaint has come down. He knows his activities are under scrutiny. And he's presented with this opportunity to get rid of his nemesis. He's the one who is the charging officer. So what are we supposed to make of the switch? I mean, what is the, I mean, to hear you talk now, it sounds like you think that is legally irrelevant. Okay, so I want to hear where that fits into the analysis. I don't think the switch is irrelevant, obviously, because that is what the railroad is saying has led to the reason for the termination, right? The question is whether or not Van Blarkham, as the charging officer and the proponent of the only substantive evidence outside the fact that the switch was thrown in the wrong direction, who couldn't explain that evidence, didn't bring in any expert to that evidence, if that factor contributed even 1% to the ultimate outcome of Mr. Zapata being terminated, then I think we have met our burden on the contributory factor. Just to get to the jury, now the jury is going to do what juries do, and that may be what. But I think the other, you know, obviously these cases all deal with circumstantial evidence. In the three cases that are relying on primarily by the defendant on the intervening cause, each one of those are completely different in this respect. That there was either incontrovertible evidence that the protected, excuse me, that the factual basis for the ultimate reason that the railroad gave the discharge was either accepted or irrefutable, or even admitted in some cases. But here, Zapparo absolutely denies, and these cases are all built in circumstantial evidence, and here's a man, obviously, I have no doubt, none of the court thinks that this is good behavior, right? That Van Blarkham and Lacey engaged in. I mean, that's beyond question, nobody agrees. Question is, and it's protected activity, we have that. Question is, are they linked? Well, this- I'm sorry, I didn't hear the words. The last question is whether they are linked. Yeah, sorry. Well, counsel, let me do this. I know you've reserved two minutes for rebuttal, unless there are any other questions right now from the panel. Why don't we turn to counsel for the appellee? Thank you, your honor. Thank you, your honors. Counsel for the appellee, Joseph Devine for CSX. Let me start with the questions that were asked to co-counsel. Can I ask you an off the wall question? Certainly. The answer is always yes. This line that we're talking about, the railroad line, the switch, that's not a passenger line, is it? I simply don't know the answer, your honor. But whether it's a main line, we share- It's just as I'm trying to imagine what's happening, you know? Yeah, yeah. I was kind of, it doesn't matter as to the law, but as to the picture in my head, it does. Yeah, and I simply don't know the answer, your honor. We do share rightage with Amtrak and other commuters, so it's possible, but I simply don't know. But to address the very first question, Murray does not control this case. When the Supreme Court listed the, quote, similar whistleblower statutes, and dropped footnote one, it did not drop the FRSA, okay? Even though it knew from Murray that Tompkins was involved, and they cited Tompkins. But they were very careful to say, and the Second Circuit said, that it was virtually identical language. It is not virtually identical language. But you don't have to get there, your honors. You simply don't have to get there. This is a causation case, right? Two ways that the district court is correct. Number one, there's no prima facie case to establish any causal link at all. Regardless of the contributing factor, motivating, whatever, there's none. Because of the intervening act on June the 9th with the switch. But the question is, it's not the intervening act, but whether or not it was contributing, right? Isn't that ultimately what we have to deal with? because at that point, I mean, because part of the argument is because he was complaining. He made it easy, right? He made a mistake that gave a reason. But the intervening act suggests that there's, that eliminates or that inoculates somebody against what is perhaps a discriminatory punishment or reaction. And that's not what our cases account for. Our cases account for like a mixed motive or a contributing factor. Well, and that's why there are three ways, three pieces of why it's clear and convincing that we would have done it anyway. Number one, the treatment of others. In 26, the evidence is clear and unrefuted in the record. In 2016, conductors five of the six were terminated, including Zapparo. So four others, employees number 11, 12, 13, 14 in the record, okay, were all conductors in 2016, and they were all terminated at Zapparo. One was not- But if we're in the business of having to decide how close they were, I mean, you could either say four of the conductors or four of the five of the conductors. They say six out of the 17 employees. Once we start doing that, doesn't that become a jury question? No, Your Honor, because the ones they point to are more remote in time. 2016 is the year in question, right? 2016 is when this happened. And in 2016, four of, I'm sorry, five of the six. And then they also point to two engineers, employees 15 and 17. I don't think you should include them because they're engineers and not conductors. But even if you do, it's still six of eight. Clear and convincing, five of six or six of eight gets you there. Second factor is, you know, what Murray, the way Murray does apply is when you talk about how to deal with the same action defense. And Murray says, remove the protected activity and what changes? Here, absolutely nothing changes because they are totally separate events. He still would have been assigned to the same train, still would have failed to fix the track. The police would have come, the inspectors would have come. They still would have had that. And then the hearing officer, there's no evidence in the record that the hearing officer had any knowledge of protected activity. There's no evidence in the record that the decision maker, Mr. Stetzer, had any knowledge of the protected activity. All of those factors prove clear and convincing evidence. In addition to the gravity of the situation. I'm essentially loosely going through the Spielberg. I'm glad you just mentioned that. I'm looking at your brief, the catastrophic lethal collision. How can you make a claim that it could be catastrophic and lethal if you don't even know if it's a passenger train? Why? East Palestine was not a passenger train. East Palestine. No, I mean, my colleague in the beginning asked what goes on that line and I understood your answer to be, I don't know. If you don't know what is on that line, how can you say just there, devastating whatever word you use, and words like catastrophic lethal. Catastrophic and lethal because the railroad industry is, people die on the rails in the freight industry all the time. People pass away. Freight trains have engineers too. Yeah, freight trains have engineers. People who are switching cars, the first decision on Zaporo specifically found or said that with catastrophic consequences. I mean, that was in the first, so I used catastrophic there because this court did, but no, I don't know if that meant a train full with 100 people or whether or not the engineer and the conductor who are in the locomotive cab go slamming into the back of a parked rail car. Either way, it's lethal and potentially catastrophic. My opposing counsel went through the Tompkins factors. I believe the Tompkins factors still apply, and I believe they apply in our favor. One, there's no connection at all between the discipline and the protected activity. Keep in mind that the protected activity is limited here not to the complaints about the falsification, but about the complaints of the stress and distraction that caused an unsafe workplace, and it's only those complaints that this court found to be protected before. And those are not, you know, that happened May 3rd and 5th. The termination is July 15th. So the timing piece cuts both ways, but we do have the intervening event. As your honor noted, the. Can you harmonize the intervening event with the idea of a contributing factor or a mixed motive theory? Like where does it work? How do they all fit together? They all fit together because we are talking about cause, and the language in intervening event is does it independently support the termination? Here, our contention is you take away anything he said about, oh, I'm stressed. Okay, maybe. I just, I think we need to push it a little bit. Like certainly if you could have, like let's imagine a scenario in which, you know, ten people do the exact same thing, and you only fire five of them. Maybe it's on account of race discrimination. Would you say that because you could independently fire the five that you fired that somebody wouldn't have some sort of other claim? Our evidence, though, your honor, is five of six in 2016. No, that's, I mean, I'm just asking, the question I'm asking is how do we account for your intervening act, which as I understand you to say is a get out of jail free. Like it doesn't matter, it doesn't matter if we were discriminatory, it doesn't matter if we were problematic, it doesn't matter if we were retaliation. If they gave us a reason and we take it, then that's enough, notwithstanding the fact that if somebody else did the same thing and we didn't, we would be fine. So I want you to explain to me how the intervening act squares with the idea of a contributory, like a contributing factor or a mixed motive theory. Because we're not disputing that he, that at least now for his purposes that he did something that a lot of people think was really bad. The, in your question, we're conflating. Well, I'm asking you to help me. I'm trying to think it through, your honor. But what we're conflating is the sole reason, we're not saying it contributed at all, because if it contributed at all and Murray applies, which I don't think it does, then you have an issue. And just for the record, you know, the reason the FRSA is different than SOX is because in the FRSA, it actually says in subsection A, in whole or in part. That means contributing. It doesn't say that in B or C. And the incorporation language of error 21 in D specifically refers to D1 cases. We're in a D3 case because we're before your honors. I would invite you to take a look at the questions raised by Judge Sutton in the Sixth Circuit Lemon case in that regard. But to get back to your issue, if the independent intervening act stands on its own and there is no genuine issue of material fact that we would have fired him without the comments, then we win. Okay, even, so nobody could ever make a claim that you're firing some people and not firing others for a discriminatory reason under your theory. Is that right? The affirmative defense does let you out even if it's a mixed motive. That's how it works. Okay, that's what I thought you were saying and I want to just have it clear that that's what you're asking us to rule. Okay. Thank you. Thank you very much. Why don't we hear from counsel for the appellant? Yes. We've got two minutes on the clock. One quick housekeeping thing. The issue of Pat Riley as an expert is also before the court. I read that report. Frankly, in light of the last support decision, I should have withdrawn that. And so I spoke with Mr. Devine and I don't think he has an objection. And I don't know if this is appropriate, but I'd like to withdraw him as an expert, vacate the judgment and maybe find that that decision is moot. But I don't want to waste any money. Say that a little bit more slowly. Sure. I wasn't thinking this is what you were going to talk about in rebuttal. Tell me what you're proposing that we do here. Respectfully, that the trial court's decision with respect to, first of all, that the record shows I'm withdrawing Mr. Riley as an expert, that the decision of the trial court be vacated as moot. The decision, what decision? The decision of the trial court in excluding Mr. Riley as an expert. We don't vacate rulings. We vacate judgments, right? Yeah, I guess you're right. So however be done. That's why I'm not following. I think, yeah, you don't get to vacate the judgment by you conceding something. I think that would be a win. Right, right, right. That would be a good trick for appellants in general to just concede that they should win or something. Yeah, and that would be, right? Yeah, right. Anyway. I don't think we have occasion to rule on some issues that district courts are fined by. I understand that you're saying that is a concession that if to the extent it folds into our decision making. That I get. Yes, thank you. But I don't think there's a decreed thing that comes from us. I should have looked at it before, but. No, no, no. Okay. Anyway, 2016, there's nothing magical about 2016 to limit it to five out of six people who were fired. The trial court at the special appendix six said six out of 17. And I went to law school, so I'm not good at math, but I know that's less than 50%. I don't think it gets close to the standard of clear and convincing evidence. So now, at the- Those were, many of those were from some other year, I guess, so. I'm sorry?  That's right, that's right. So if the evidence was coupled- January 1st, 2017, that would be considered not. Well, under their analysis, yeah. But there's nothing magical about limiting it to one year. Yeah, and so- I think we have your argument. Unless there are any other questions right after the panel, we'll take the case of an advisement. And I think you should all just keep your ears open, so that if there is a subsequent decision that comes out of Murray, it may be the case that the court would solicit additional briefing from you, but I think that we'll let you know if and when we get there. Great, thank you, thank you, have a nice weekend. Thank you, we will take the case under advisement. Having completed